1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 UNITED STATES OF AMERICA,                    Case No.  13-cr-00780-JST-1

         Plaintiff,

8                                              **ORDER**

      v.

9

10 WILLIAM L. MAROTZ,

         Defendant.

11

12

13          William Marotz appeals his conviction of 41 C.F.R. § 102-74.390.  For the reasons set

14 forth below, the judgment of conviction is reversed.

15 **I.      PROCEDURAL BACKGROUND**

16          The United States charged Defendant William Marotz in an information with one

17 misdemeanor violation of 41 C.F.R. § 102-74.390 (disorderly conduct), based on conduct that

18 occurred on September 10, 2013 at the San Francisco Federal Building.  The case was tried to the

19 court on April 4, 2014.  At the conclusion of the Government's case, Marotz moved for a

20 judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 based on a lack of

21 sufficient evidence presented at trial that (i) notice of the government regulations was posted in a

22 conspicuous place and (ii) CSO Wilson was a federal government employee at the time of the

23 incident.

24          The court reserved ruling on Marotz's Rule 29 motion.  On April 14, 2014, the court

25 rendered a judgment, ECF No. 13, convicting Mr. Marotz of the sole charge in the information.[1]

26

27

28 ───────────────
[1] The trial court did not rule on the Rule 29 motion.

United States District Court
Northern District of California

1  On April 23, 2014, the defendant timely renewed his Rule 29 motion, ECF No. 15, which the
2  court denied, ECF No. 18.

3       Marotz thereafter filed a timely notice of appeal.  ECF No. 16.

4  **II.    STATEMENT OF FACTS**

5       The facts are largely undisputed.

6       The government called one witness, Walter Wilson.  Wilson works as a Court Security
7  Officer ("CSO") in the Phillip Burton Federal Building on Golden Gate Avenue in San Francisco.
8  The Federal Building, as its name would suggest, is federal property.

9       CSO Wilson described his job as "provid[ing] security in the building" and "maintain[ing]
10  calm and orderly conduct on the court floors."  CSO Wilson has fourteen years of experience as a
11  CSO, most of which have been spent in the Federal Building.  On September 10, 2013, at
12  approximately 10:40 a.m., he was working as a CSO at the San Francisco Federal Building when
13  he was notified that an individual who had previously been identified in a Marshal's notice as the
14  "Dog Man" had entered the building and that he was "already angry and loud." (Id. at 4:4-14).
15  CSO Wilson, who had seen the Dog Man before, identified him in court as Marotz. (Id. at 4:19,
16  5:9-11).  CSO Wilson was aware of the Dog Man due to the "alert notice" that was posted in his
17  office, which states that Dog Man is "disruptive and he's loud and he uses profane language."  (Id.
18  at 5:22-24).  He explained that, based on this alert notice, the CSOs do not automatically remove
19  Mr. Marotz; rather, the CSOs "observe them" and "unless they create a disturbance, we let them
20  in, leave them alone." (Id. at 8:17-23).

21       CSO Wilson had seen Marotz before, but had never previously cited him for any offense.
22  CSO Wilson testified that a notice, posted in the CSOs' office, alerted all CSOs that Marotz had
23  entered the Federal Building in the past and had been "disruptive . . . loud . . . [and] use[d] profane
24  language."  The notice referred to Marotz as "Dog Man" as a means of identification, because
25  Marotz often brought his dog to the courthouse.  The notice informed the CSOs that Marotz "has
26  had to be escorted out of numerous courthouses for being profane, argumentative, and disruptive"
27  and warned that Marotz "was uncooperative and used extreme profanity" when previously
28  removed.  Specifically, the notice read that on July 24, 2013, Appellant had to be removed from

United States District Court
Northern District of California

1  the Oakland District Courthouse.  On the notice, supervisors instructed CSOs to perform "tight"

2  screening and surveillance on Appellant.  On September 10, CSOs did not prevent Marotz from

3  entering the Federal Building, but they did watch him closely pursuant to the alert.

4       Marotz ascended to the 15th floor, where multiple courtrooms are located.  CSO Wilson

5  had worked on the 15th floor before, and he testified that people normally remain quiet there.

6  CSO Wilson did not normally hear outbursts of shouting, yelling, or swearing on the 15th floor.

7  On the date in question, before Marotz arrived on the 15th floor, the noise level on the floor was

8  quiet.

9       After Appellant arrived on the 15th floor, CSO Wilson heard Appellant loudly yelling

10  "Nazi" at the CSOs located near the elevator.  Appellant approached a CSO and yelled, "You Nazi

11  bitch whore, I would like to take a knife and stick it in your back."  During the trial, CSO Wilson

12  demonstrated for the Court the extremely loud volume at which Appellant yelled this phrase.[2]

13       At that time, CSO Wilson told Marotz "he need[ed] to stop," and demanded that Marotz

14  leave the building.

15       CSO Wilson then entered an elevator with Marotz and descended to the lobby.  During that

16  elevator ride, Appellant continued to make remarks that CSO Wilson construed as threatening.

17  Marotz said he "could take [CSO Wilson] down anytime he wants to," and, "It would take three of

18  [you] to take [me] down."   Marotz also said he was "third in the state at wrestling."  When they

19  entered the lobby, Marotz repeatedly and loudly called CSO Wilson a "Nazi."  CSO Wilson also

20  demonstrated the volume of Appellant's yelling in the lobby.  As CSO Wilson escorted Appellant

21  from the building, Appellant attempted to make a sudden left turn away from the door.  CSO

22  Wilson placed his hand on Appellant's shoulder and directed him towards the door, demanding

23  that he exit the building.  Appellant refused to comply either with CSO Wilson's verbal requests,

24  or his physical encouragement to leave.[3]  CSO Wilson and another CSO then took Appellant to the

25

26  _____
    [2] The Court has reviewed the audio recording of the trial for the purpose of evaluating the noise
    level of the witness' testimony.

27  [3] Building security cameras captured this exchange, and the trial court entered a video of this
    altercation into evidence.  The Government alleges that Appellant "spun around and went into a

28  fighting stance."  The video footage does not support this characterization.

1  ground, and Federal Protective Services arrested him.

2  **III.   LEGAL STANDARD**

3       In a criminal appeal, an appellate court must "construe the evidence 'in the light most

4  favorable to the prosecution,' and only then determine whether '*any* rational trier of fact could

5  have found the essential elements of a crime beyond a reasonable doubt.'" United States v.

6  Nevils, 598 F.3d 1158, 1161 (9th Cir. 2010) (emphasis in original) (citing Jackson v. Virginia, 443

7  U.S. 307, 319 (1979)).

8       After a conviction before a magistrate judge, "[t]he defendant is not entitled to a trial de

9  novo by a district judge.  The scope of the appeal is the same as in an appeal to the court of

10  appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D).

11       Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, when the defendant makes

12  a motion for judgment of acquittal at the close of the government's case and the trial court

13  reserves ruling until the end of the trial, the court may only review evidence introduced prior to

14  Appellant's motion for a judgment of acquittal. Fed. R. Crim. P. 29(b); *see also United States v.*

15  *Cruz*, 554 F.3d 840, 844 n.4 (9th. Cir 2009) (noting that when a district court reserves ruling on a

16  motion for judgment of acquittal made at the close of the government's case, the appellate court

17  rules only based on the evidence presented at the time of the motion).

18  **IV.   DISCUSSION**

19       **A.   The Government Did Not Need To Prove That Officer Wilson Was A**
20            **Government Employee**

21       Marotz first argues that his conviction should be reversed because the United States failed

22  to prove that CSO Wilson was a "Government employee" within the meaning of section 102-

23  74.390.  But that regulation contains three separate potential violations, the last of which has four

24  subparts.  Only one subpart of one potential violation mentions Government employees:

25       All persons entering in or on Federal property are prohibited from loitering,
        exhibiting disorderly conduct or exhibiting other conduct on property that – (a)
26       Creates loud or unusual noise or a nuisance; (b) Unreasonably obstructs the usual
        use of entrances, foyers, lobbies, corridors, officers, elevators, stairways, or parking
27       lots; (c) Otherwise impedes or disrupts the performance of official duties *by
        Government employees*; or (d) Prevents the general public from obtaining the

28

United States District Court
Northern District of California

4

administrative services provided on the property in a timely manner.

41 C.F.R. § 102-74.390 (emphasis added).  As the language of the regulation clearly shows, the Government need prove an element of government employment only when charging a violation of subpart (c) – "exhibiting other conduct on property that . . . [o]therwise impedes or disrupts the performance of official duties by Government employees."

Here, the United States did not charge Marotz with a violation of subpart (c).  The Government's theory at trial and on appeal is that Marotz violated subsection (a) – by creating a loud or unusual noise or nuisance – and the first part of the statute, which prohibits "disorderly conduct."  Therefore, the government did not need to prove that CSO Wilson was a government employee.[4]

### B.     The Government Failed to Prove That Marotz Received Actual Notice

Marotz also appeals his conviction on the ground that he did not receive sufficient notice that his conduct was illegal before he was arrested.  To establish a violation of 41 C.F.R. § 102-74.390, the Government must present sufficient evidence that the defendant received actual notice.

The statute governing the management of federal property, and authorizing enforcement of the rules to be followed while on federal property, requires posted notice of the relevant federal rules and regulations.  40 U.S.C. § 1315(c), under which section 102-74.390 is promulgated, provides as follows:

> The secretary, in consultation with the Administrator of General Services, may prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property. The regulations may include reasonable penalties . . . for violations of the regulations. *The regulations shall be posted and remain posted in a conspicuous place on the property.*

40 U.S.C. § 1315(c) (emphasis added).  Title 41 of the Code of Federal Regulations outlines an identical requirement for all property under GSA control:

> The rules in this subpart apply to all property under the authority of GSA and to all persons entering in or on such property.  Each occupant agency shall responsible for the observance of these rules and regulations.  *Federal agencies must post the notice in the Appendix to this part at each public entrance to each facility.*

---

[4] Marotz abandoned this theory in his reply brief.

1   41 C.F.R. § 102-74.365 (emphasis added).

2        The parties agree that there was no evidence that the regulations in question were posted

3   "in a conspicuous place" as required by 40 U.S.C. § 1315(c) and 41 C.F.R. § 102-74.365.  The

4   Ninth Circuit has held, however, that giving a defendant actual notice that his conduct is illegal

5   prior to arrest "fulfills the rationale behind the conspicuous posting requirement," and excuses

6   compliance with the public posting regulations.  United States v. Bichsel, 395 F.3d 1053, 1056

7   (9th Cir. 2005).  In Bischel, the defendant was a protester who chained himself to a federal

8   courthouse.  A Federal Protective Service officer Bichsel that he "had to take the chains off" so

9   that the courthouse doors could be opened.  When Bichsel refused, the officer informed him that

10  he had five minutes to unchain himself, or he would be arrested.  Bichsel, 395 F.3d at 1054.

11  Because Bichsel must have known at that point that his conduct was illegal, there was no need for

12  the Government to have post noticed before arresting him.  Id. at 1057.

13       In the present case, the Government acknowledges that "[s]ufficient actual notice

14  requires . . . notice of the illegality of an action," and argues that Appellant received such notice

15  because CSO Wilson told him that he needed to stop his disruptive conduct, although CSO Wilson

16  never told Appellant that his conduct was illegal, or that he would be arrested if he didn't stop his

17  behavior.  In almost every case cited by the Government, however, the defendant either

18  acknowledged that his conduct was illegal, or he was given notice that it was.  See Bichsel, supra;

19  United States v. Baldwin, 745 F.3d 1027, 1034 (10th Cir. 2014) (finding actual notice when the

20  defendant admitted to knowing he should not disregard orders from an officer and flee police);

21  United States v. Davis, 339 F.3d 1223, 1228 (10th Cir. 2003) (finding actual notice when

22  authorities told the defendant that his business practices were illegal); United States v. Cassiagnol,

23  420 F.2d 868, 874 (4th Cir. 1970) (finding that warnings of possible arrest sufficed as notice

24  because they apprised the defendants of the illegality of their actions); United States v. Strakoff,

25  719 F.2d 1307, 1310 (5th Cir. 1983) (holding that the reason for the posted notice requirement is

26  "to impart the prohibitions" of the regulations); United States v. Jenkins, 2:12-MC-50376, 2013

27

28

1    WL 3762454, at *3 (E.D. Mich. July 17, 2013) (finding actual notice when CSOs warned the

2    defendant that he was interfering with the CSOs' duties and could be arrested).[5]

3           The only case cited by the Government in which officers did not tell the defendant his

4    conduct was illegal or warn him he would be arrested is United States v. Baldwin, 745 F.3d 1027

5    (10th Cir. 2014).  In that case, the Court of Appeals never reached the issue of notice, because

6    defendant failed to present that defense at trial.  Id. at 1029.

7           Based on this authority, the Court concludes that actual notice requires that law officers

8    give a potential arrestee notice that he will be arrested if he continues his objectionable conduct.

9    Accordingly, the Court finds that the Government did not meet its burden of proving either the

10   conspicuous public posting required by 40 U.S.C. § 1315(c) and 41 C.F.R. § 102-74.365, or actual

11   notice of the kind described in Bichsel, supra, 395 F.3d at 1056.

12          The Court emphasizes that Appellant's conduct was loud, disruptive, offensive, and

13   inappropriate to a federal courthouse.  Members of the public, court users, and court staff all have

14   a right to be free from such conduct.  If the Government had publicly posted a copy of 41 C.F.R.

15   § 102-74.390 as required by regulation, CSO Wilson would have had the authority to arrest

16   Appellant.  Similarly, had Appellant continued his conduct after being told that it would lead to

17   his arrest, that too would have given CSO Wilson the authority to arrest him.  But in the absence

18   of evidence that the Government complied with its notice obligations, Appellant's conviction must

19   be reversed.[6]

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25

26   [5] The foregoing case parentheticals are quoted from the Government's brief.

27   [6] It is possible that Marotz's actions in physically resisting CSO Wilson's orders to leave the
     building also gave officers grounds to arrest him, but he was not charged with an offense in
28   connection with that conduct.

United States District Court
Northern District of California

7

1

## CONCLUSION

2        The judgment of conviction is reversed.

3        **IT IS SO ORDERED.**

4  Dated:  December 6, 2014

5

6  _____
                    JON S. TIGAR
7                   United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28